## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:20-cv-1825-RLY-TAB |
| CONNIE LAWSON, in her official capacity | ) | |
| as Indiana Secretary of State; PAUL | ) | |
| OKESON, S. ANTHONY LONG, | ) | |
| SUZANNAH WILSON OVERHOLT, and | ) | |
| ZACHARY E. KLUTZ, in their official | ) | |
| capacities as members of the Indiana Election | ) | |
| Commission; J. BRADLEY KING and | ) | |
| ANGELA NUSSMEYER, in their official | ) | |
| capacities as co-directors of the Indiana | ) | |
| Election Division; and RAY ADLER, PAUL | ) | |
| RAUSCH, KEVIN C. SMITH, and | ) | |
| RANDALL VONDERHEIDE, in their | ) | |
| official capacities as county election officials, | ) | |
| and as representatives of a class of all | ) | |
| members of Indiana county election boards | ) | |
| and boards of elections and registration, | ) | |
| | ) | |
| *Defendants.* | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Gregory M. Schweizer
Brent R. Austin (*pro hac vice forthcoming*)
Sarah Kinter (*pro hac vice forthcoming*)
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
(312) 660-7648 (tel.)
gschweizer@eimerstahl.com
baustin@eimerstahl.com
skinter@eimerstahl.com

Aneel L. Chablani (*pro hac vice forthcoming*)
Ami Gandhi (*pro hac vice forthcoming*)
Jennifer Terrell (*pro hac vice forthcoming*)
Chicago Lawyers' Committee for Civil Rights
100 North LaSalle Street, Suite 600
Chicago, IL 60602
(312) 888-4191 (tel.)
achablani@clccrul.org
agandhi@clccrul.org
jterrell@clccrul.org

Dated: July 8, 2020

*Attorneys for Common Cause Indiana*

*Additional Counsel listed on signature page*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

LEGAL STANDARD ............................................................................................................. 7

STANDING .............................................................................................................................. 7

ARGUMENT ........................................................................................................................... 9

    I.   Common Cause Indiana Is Likely to Succeed on the Merits ........................................ 9

        A.  The Challenged Amendments, Separately and Together, Place an
           Unconstitutional Burden on the Fundamental Right to Vote .................................. 10

           1.  The Standing Amendment Places an Unconstitutional Burden on the
              Fundamental Right to Vote of All Indiana Voters ........................................... 11

           2.  The Remedies Amendment Places an Unconstitutional Burden on the
              Fundamental Right to Vote of All Indiana Voters ........................................... 15

           3.  The Challenged Amendments Together Place an Unconstitutional
              Burden on the Fundamental Right to Vote of All Indiana Voters ................... 19

        B.  The Standing Amendment Violates Procedural Due Process ................................. 20

        C.  The Challenged Amendments Violate the Supremacy Clause ............................... 24

    II.  Absent an Injunction, Common Cause Indiana, and Its Members, Are
        Threatened by Irreparable Harm With No Adequate Remedy at Law ........................ 27

    III.  The Balance of Harms Tips Decisively in Favor of Common Cause Indiana and
        Its Members ................................................................................................................. 30

    IV.  The Public Interest Clearly Favors the Fundamental Right to Vote ............................ 31

CONCLUSION ...................................................................................................................... 32

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Americana Healthcare Corp. v. Schweiker,*
  688 F.2d 1072 (7th Cir. 1982) ............................................................... 22

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ..................................................................... 10, 14

*Armstrong v. Manzo,*
  380 U.S. 545 (1965) .......................................................................... 21

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ..................................................................... 10, 19

*Common Cause Ind. v. Lawson,*
  327 F. Supp. 3d 1139 (S.D. Ind. 2018) .............................................. 27, 28

*Common Cause Ind. v. Lawson,*
  937 F.3d 944 (7th Cir. 2019) ............................................................ 7, 8

*Common Cause Ind. v. Marion Cty. Election Bd.,*
  311 F. Supp. 3d 949 (S.D. Ind. 2018) ................................................... 14

*Common Cause Ind. v. Marion Cty. Election Bd.,*
  925 F.3d 928 (7th Cir. 2019) .............................................................. 14

*Common Cause/Ga. v. Billups,*
  406 F. Supp. 2d 1326 (N.D. Ga. 2005) ................................................. 10

*Crawford v. Marion Cty. Election Bd.,*
  553 U.S. 181 (2008) ............................................................... 10, 13, 14

*Democratic Nat'l Comm. v. Bostelmann,*
  No. 20-CV-249-WMC, 2020 WL 1638374 (W.D. Wis. Apr. 2, 2020) ............. 30, 31

*Elrod v. Burns,*
  427 U.S. 347 (1976) .......................................................................... 27

*Ennenga v. Starns,*
  677 F.3d 766 (7th Cir. 2012) ................................................................ 3

*Ex Parte Young,*
  209 U.S. 123 (1908) .......................................................................... 10

*Ezell v. City of Chi.*,
    651 F.3d 684 (7th Cir. 2011) ................................................................................ 27

*Foodcomm Int'l v. Barry*,
    328 F.3d 300 (7th Cir. 2003) ................................................................................ 27

*GEFT Outdoors, LLC v. City of Westfield*,
    922 F.3d 357 (7th Cir. 2019) ........................................................................ 7, 9, 30

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of Am. Inc.*,
    549 F.3d 1079 (7th Cir. 2008) ................................................................... 28, 29, 31

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966) .............................................................................................. 10

*Hathaway v. Mathews*,
    546 F.2d 227 (7th Cir. 1976) ................................................................................ 22

*Haywood v. Drown*,
    556 U.S. 729 (2009) ................................................................................... 24, 25, 26

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ................................................................................................ 7

*Hunter v. Hamilton Cty. Bd. of Elections*,
    635 F.3d 219 (6th Cir. 2011) ................................................................................ 31

*In re Hearst Newspapers, L.L.C.*,
    641 F.3d 168 (5th Cir. 2011) ................................................................................ 21

*Ind. State Conference of the NAACP v. Lawson*,
    326 F. Supp. 3d 646 (S.D. Ind. 2018) .................................................................. 27

*J.P. Morgan Sec. LLC v. Weiss*,
    No. 1:19-cv-04163-TWP-MPB, 2019 WL 6050176 (S.D. Ind. Nov. 15, 2019) ................... 3, 4

*Knutson v. Vill. of Lakemoor*,
    932 F.3d 572 (7th Cir. 2019) ................................................................................ 21

*Kress v. United States*,
    382 F. Supp. 3d 820 (E.D. Wis. 2019) ................................................................... 3

*Lawrence v. Reed*,
    406 F.3d 1224 (10th Cir. 2005) ............................................................................ 21

*League of Women Voters of Fla., Inc., v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) ................................................................. 14

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ........................................................... 27, 28

*Luft v. Evers*,
  No. 16-3003, 2020 WL 3496860 (7th Cir. June 29, 2020) ..................... 19

*Marozsan v. United States*,
  852 F.2d 1469 (7th Cir. 1988) ......................................................... 23, 24

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ............................................................................ 21

*Michigan v. U.S. Army Corps of Eng'rs*,
  667 F.3d 765 (7th Cir. 2011) ............................................................... 28

*Nat'l Broad. Co. v. Cleland*,
  697 F. Supp. 1204 (N.D. Ga. 1988) ....................................................... 10

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ......................................................... 27, 31

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) ............................................................................. 13

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ............................................................................... 31

*Reynolds v. Sims*,
  377 U.S. 533 (1964) ........................................................................... 10

*Roland Mach. Co. v. Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984) ............................................................... 28

*Severson v. Bd. of Trustees of Purdue Univ.*,
  777 N.E.2d 1181 (Ind. Ct. App. 2002) ................................................... 25

*Sherman ex rel. Sherman v. Twp. High Sch. Dist. 214*,
  540 F. Supp. 2d 985 (N.D. Ill. 2008) ..................................................... 10

*Skolnick v. Bd. of Comm'rs*,
  435 F.2d 361 (7th Cir. 1970) ................................................................. 3

*Toney v. Burris*,
  881 F.2d 450 (7th Cir. 1989) ............................................................... 22

*Town Court Nursing Ctr., Inc. v. Beal*,
  586 F.2d 266 (3d Cir. 1978) ................................................................ 22

*Tripp v. Scholz,*
    872 F.3d 857 (7th Cir. 2017) ........................................................................ 10, 13

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    858 F.3d 1034 (7th Cir. 2017) ............................................................................ 28

*Whole Woman's Health All. v. Hill,*
    937 F.3d 864 (7th Cir. 2019) ............................................................................. 31

*Williams v. Salerno,*
    792 F.2d 323 (2d Cir. 1986) ............................................................................... 27

*Williamson v. United Airlines, Inc.,*
    No. 1:03-cv-1456-SEB-TAB, 2008 WL 4298090 (S.D. Ind. Sept. 15, 2008) ............ 3

*Worley v. Waddell,*
    819 F. Supp. 2d 826 (S.D. Ind. 2011) .................................................................. 21

**Statutes**

10 Ill. Comp. Stat. Ann. 5/17-15 ............................................................................... 6

42 U.S.C. § 1983 ............................................................................................ 2, 25, 26

52 U.S.C. § 21082 ................................................................................................... 13

Ind. Code § 3-6-4.1-14 ............................................................................................ 32

Ind. Code § 3-11.7-2-1 ............................................................................................ 13

Ind. Code § 3-11.7-7-2 ..................................................................................... passim

Ind. Code. § 3-11.7-7-3 .................................................................................... passim

Ind. Code § 3-11.7-7-4 ..................................................................................... passim

Ind. Code § 3-11-8-8 ......................................................................................... 12, 13

Ky. Rev. Stat. Ann. § 118.035 ................................................................................... 6

Mo. Ann. Stat. § 115.639 .......................................................................................... 6

Ohio Rev. Code Ann. § 3599.06 ................................................................................. 6

Wis. Stat. Ann. § 6.76 ............................................................................................... 6

**Rules**

Fed. R. Evid. 201(b)............................................................................................................. 3

**Other Authorities**

*On Legislative Courts, Administrative Agencies, and Article III*,
     101 Harv. L. Rev. 916 (1988)..................................................................................... 23

**INTRODUCTION**

On Election Day in November 2018, disenfranchising conditions at polling places in at least three Indiana counties threatened to deny eligible citizens their fundamental right to vote, leading to state-court actions seeking to extend polling-place hours to prevent such irreparable harm.  Shortly thereafter, the Indiana Election Code was amended to strip voters of standing to request an hours extension in state court.  Instead, under the 2019 amendments, only a unanimous county election board—composed of the very officials responsible for administering elections—can request an extension of polling-place hours in state court, and voters have been given no statutory guidance on how to petition their county officials to seek such relief.  Moreover, even when county officials do seek a state court's assistance, the amendments also strip courts of authority to extend hours for any reason other than the physical closure of voting sites, eliminating their ability to extend hours where voters are functionally denied their right to vote even if the doors of their polling place technically remain open. These amendments are incompatible with the United States Constitution's guarantee that every eligible Indiana citizen be able to exercise—and protect—their fundamental right to vote.  The amendments should be enjoined before they inflict such irreparable constitutional harm on Indiana voters in the November 2020 General Election.

The constitutional infirmities of these statutory changes are threefold.  First, barring voters from pursuing extensions of polling-place hours in state court, providing no defined mechanism to request that their county election officials seek such relief, and banning hours extensions where conditions at polling places deny citizens the right to vote but fall short of physical closure all place severe burdens on the fundamental right to vote.  In the absence of any

relevant and legitimate state interest, such burdens violate the First and Fourteenth Amendments to the United States Constitution.

Second, by eliminating voters' ability to seek an extension of polling-place hours in state court, the 2019 amendments deprive voters of the procedural due process rights guaranteed them by the Fourteenth Amendment.  Before the fundamental right to vote can be denied, the Constitution requires that a voter have an opportunity to be heard.  The challenged provisions deprive Indiana voters of *any* such opportunity in state court and further provide no procedure for voters to seek the aid of their county officials in extending polling-place hours when needed. In lieu of procedural safeguards, the challenged provisions vest the very officials tasked with administering elections with the sole authority to seek an extension of polling-place hours.  This codifies a conflict of interest and immunizes state and county officials from judicial review in derogation of voters' due process rights.

Finally, the Supremacy Clause of the United States Constitution does not permit a state to strip its courts of general jurisdiction of authority to hear and provide relief for a specific subset of federal constitutional claims under 42 U.S.C. § 1983.  By withdrawing voters' ability to file Section 1983 claims in state court that seek an injunction extending polling-place hours, and by forbidding any such extension that is based on disenfranchising conditions other than a physical closure, the challenged amendments establish a state-specific carve-out to Section 1983 that is prohibited under the Constitution's system of federalism.

In short: While Election Day generally is organized and conducted by well-intentioned state and county election officials, the fast-paced nature of the day often results in imperfect administration of the franchise, including the emergence of conditions at individual polling places that can cause disenfranchisement.  Delayed openings, midday closures, ballot shortages,

equipment failures, long lines, or other unforeseen problems can all cause voters with work, school, childcare, eldercare, or other responsibilities that prevent them from enduring long wait times to be turned away without casting a ballot.  An extension of polling-place hours can provide relief from these conditions, but the challenged amendments shut Indiana's courthouse doors to voters seeking such assistance and hamstring state courts' ability to provide this remedy in all but the most egregious circumstances.  In doing so, the amendments imperil the fundamental right to vote guaranteed to all Indiana citizens by the United States Constitution. They must, therefore, be enjoined.

## BACKGROUND

Before 2019, Indiana voters, political parties, candidates for public office, and public interest groups could bring an action in state court to extend polling-place hours at sites where closures, ballot shortages, equipment malfunctions, or other conditions compromised access to the ballot box.  Compl. ¶¶ 27-30.[1]  The importance of this avenue for relief was made plain during the November 2018 General Election, when state courts in Porter, Johnson, and Monroe Counties all received petitions seeking extensions of polling-place hours, due to delayed polling-place openings, long lines caused by equipment malfunctions, and ballot shortages, respectively.

---

[1] The complaint provides sources (in footnotes) to support its factual allegations.  All of these sources have been provided to the Court via the Schweizer Declaration, attached as Exhibit 1 to Plaintiff's motion (ECF Nos. 3.1-3.33).  The Schweizer Declaration identifies each source and its corresponding paragraph(s) and footnote(s) in the complaint.  Most of these sources are news articles cited for a specific fact "generally known within the trial court's territorial jurisdiction" and/or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Such facts are judicially noticeable.  *Kress v. United States*, 382 F. Supp. 3d 820, 829-30 (E.D. Wis. 2019) (facts in news articles not subject to reasonable dispute); *see Williamson v. United Airlines, Inc.*, No. 1:03-cv-1456-SEB-TAB, 2008 WL 4298090, at *9 (S.D. Ind. Sept. 15, 2008) (facts in the news articles that are not "depend[ent] on the establishment of a causal connection").  Likewise, facts in the complaint sourced from state-court proceedings and U.S. Census Bureau statistics are judicially noticeable.  *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012) (state-court proceedings); *Skolnick v. Bd. of Comm'rs*, 435 F.2d 361, 363 (7th Cir. 1970) (census data).  In any event, "a district court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits."  *J.P. Morgan Sec. LLC v. Weiss*, No. 1:19-cv-04163-TWP-MPB, 2019 WL 6050176, at *4 (S.D. Ind. Nov. 15, 2019).

Compl. ¶¶ 29-31.  The polls in Porter and Monroe Counties were ordered to stay open longer, while the court in Johnson County denied the petition only because it could not be fully presented to the court before the statutory time for polling places to close had already passed.  *Id.* Voters and political parties, rather than local election officials, were the movants in two of these three actions.  *Id.*

In 2019, as part of an omnibus bill amending myriad provisions of the Indiana Election Code, the State Legislature changed the rules.  Compl. ¶ 41.  The Legislature enacted Ind. Code § 3-11.7-7-2 (the "Standing Amendment") and Ind. Code §§ 3-11.7-7-3, 3-11.7-7-4 (the "Remedies Amendment") (together, the "Challenged Amendments").  The Standing Amendment stripped voters, public interest groups, candidates for public office, political parties, and others of standing to seek an extension of polling-place hours in state court, conferring that right exclusively on the county election board responsible for administering the election.[2]  Ind. Code § 3-11.7-7-2(a); Compl. ¶ 42. Under the new law, the county election board may seek such a court order only upon the unanimous vote of all its members.  Ind. Code § 3-11.7-7-2(b); Compl. ¶ 43.  In 90 Indiana counties, the county election board comprises three people, two of whom are selected by officials of the two major political parties; in Lake and Porter Counties, the county election board comprises five people (four of whom are selected by party officials).  Compl. ¶¶ 35-39.  The Standing Amendment provides no mechanism or guidance for a voter to petition their county officials to seek an extension of polling-place hours, much less a process for what to do if county officials are unavailable or unwilling to call a meeting.  Compl. ¶¶ 45-46.  Indiana

---

[2] As explained in detail in the Complaint, there are four types of county election boards in Indiana. Compl. ¶¶ 34-40.  Some are called county election boards and others are called county boards of elections and registration.  *Id.*  All four types of boards are responsible for conducting elections and administering the election laws within their respective counties, preparing ballots, and distributing those ballots to individual precincts within the county.  *Id.*  In this brief, references to a "county election board" refer to all four types of boards, unless otherwise noted.

law also provides no standard for the county election board to apply in deciding whether to seek an hours extension and no mechanism to challenge a county election board's refusal to seek an hours extension where such refusal is unlawful or partisan.  Compl. ¶¶ 44, 48.

The Remedies Amendment restricts Indiana courts' ability to provide relief when polling places are compromised.  It permits a state court to extend polling-place hours only in instances where a voting site is physically closed, barring relief for the myriad other problems that can plague a polling place and result in voters being turned away.  Compl. ¶¶ 50-52.  For example, the Remedies Amendment would have barred the extensions of polling-place hours in Johnson and Monroe Counties in 2018, where the polling locations were not *physically closed*, but where voters were nonetheless disenfranchised due to malfunctioning equipment, long lines, and ballot shortages.[3]

Poll closures are far from the only reason a voter may be prevented from casting a ballot. Meredith Decl. ¶¶ 31-37.[4]  Every voter's decision about whether to cast a ballot is informed by the opportunity costs associated with exercising their right to vote.  *Id.* at ¶¶ 12-15.  One such cost is the amount of time a voter has to wait in line to cast a ballot.  *Id.* at ¶¶ 16, 18.  Studies show that long lines at open polling places can prevent voters from casting ballots and discourage voters from future participation; such delays, and their disenfranchising effects, have been shown to disproportionately affect communities of color.[5]  Compl. ¶¶ 54-55, 57-60;

[3] The Remedies Amendment also requires a court to find evidence that voters were prevented from casting their ballots—a difficult task if voters are prevented from voting because they cannot get inside their polling place at all or must leave a long line before voting due to work or school commitments.  Compl. ¶ 50.

[4] Plaintiff retained Dr. Marc Meredith, an expert on election mechanics and voting behavior from the University of Pennsylvania, to analyze the effects of the Challenged Amendments.  His declaration is attached as Exhibit 2 to Plaintiff's motion (ECF No. 3.34).

[5] Data from the 2016 presidential election indicates that voters of color also are more likely than white voters to experience problems at polling places, generally.  Meredith Decl. ¶¶ 24, 26.

Meredith Decl. ¶¶ 12, 17, 18, 31, 37.  When voters cannot wait in line for long periods of time in the morning or afternoon due to work, school, childcare, or other immovable commitments, an extension of hours may be the only way that they can return in time to try again.[6]  Meredith Decl. ¶¶ 38-55.  Accordingly, significant delays resulting from insufficient numbers of ballots, malfunctioning machinery, lack of poll workers, and other problems at voting sites have the same effect as those resulting from outright closures.  *See id.* at ¶¶ 21-23, 27.

As reflected in Indiana's experience in 2018, conditions causing disenfranchisement and requiring hours extensions are all but inevitable to arise at some Indiana voting locations during the November 2020 General Election—as they do at voting sites in states across the country on every Election Day.  The effects of polling-place closures and delays are especially likely to arise in the upcoming election due to the additional challenges and changes in election administration caused by the ongoing COVID-19 pandemic.[7]  The need for state courts to be able to provide relief in the form of extended polling-place hours is therefore likely to be even more acute in the November 2020 General Election.

---

[6] Unlike many states, Indiana has no law guaranteeing workers time off to vote. *See, e.g.,* 10 Ill. Comp. Stat. Ann. 5/17-15; Wis. Stat. Ann. § 6.76; Mo. Ann. Stat. § 115.639; Ky. Rev. Stat. Ann. § 118.035; Ohio Rev. Code Ann. § 3599.06; *see also* Meredith Decl. ¶ 41.

[7] In March and April of 2020, the pandemic caused by the novel coronavirus threw statewide primary elections into chaos in the nearby states of Wisconsin and Illinois.  Social distancing guidelines and widespread withdrawal by election workers worried about contracting the illness resulted in dramatic reductions in polling places in both states.  Reduced locations caused long lines, and ultimately required the extension of polling-place hours in Illinois.  On June 2, 2020, Indiana held its statewide primary election, after having delayed it from May 5, 2020, due to concerns about the novel coronavirus pandemic.  Like its neighboring states, many counties in Indiana saw the number of polling places drop dramatically in comparison to past elections, resulting in long lines that discouraged voters from participating.  The COVID-19 pandemic continues to threaten voters in Indiana.  The threat is particularly acute for Indiana's communities of color, which currently experience infection rates up to three times higher than majority-white communities.  On July 1, 2020, Governor Holcomb delayed plans to fully reopen the Indiana economy, which has been subject to restrictions designed to contain the spread of COVID-19.  Public-health officials estimate that a vaccine will not be widely available before the November 2020 election, and they believe the virus may be in full force around the time of the November 2020 election.  Compl. ¶¶ 63-68.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must demonstrate (1) "some likelihood" of success on the merits, (2) the absence of an adequate remedy at law, and (3) the threat of irreparable harm without an injunction. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). Thereafter, the court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.* (citation omitted). The higher a plaintiff's likelihood of success on the merits, the less decisively the balance of harms must favor relief. *Id.*

## STANDING

Common Cause Indiana has both organizational and associational standing to seek preliminary injunctive relief against the operation of the Challenged Amendments.[8] Compl. ¶¶ 69-77. Organizational standing to seek injunctive relief exists where an organization demonstrates "actual or imminent threat of suffering a concrete and particularized injury in fact," traceability of the injury to the defendants' conduct, and redressability of the injury by a favorable judicial decision. *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019). Associational standing exists where "(a) the organization's members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 957 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

---

[8] In support of its standing to bring this case, Common Cause Indiana incorporates herein the entirety of the Affidavit of Julia Vaughn, attached as Exhibit 3 to Plaintiff's motion (ECF No. 3.35).

The Seventh Circuit recently affirmed Common Cause Indiana's organizational standing to challenge the constitutionality of provisions of the Indiana Election Code; that court's analysis applies with equal force here. *Common Cause Ind.*, 937 F.3d at 949-957. Common Cause Indiana is a nonpartisan, nonprofit organization, whose mission includes voter education, voter access, and the elimination of barriers to voting in Indiana. Compl. ¶ 69; Vaughn Aff. ¶¶ 3, 5. Common Cause Indiana has already expended time and resources advocating against the passage of the Challenged Amendments and training its volunteers about the Amendments' effect; such time and resources were diverted from Common Cause Indiana's other work. Compl. ¶¶ 71-72; Vaughn Aff. ¶¶ 10-11, 19. Common Cause Indiana will divert additional resources in advance of and during the November 2020 General Election that would otherwise be spent on other programs, including the work Common Cause Indiana has done in elections predating the Challenged Amendments. Compl. ¶¶ 73-74; Vaughn Aff. ¶¶ 21-23, 25-26. The prospective drain on a voter-advocacy organization's resources as a result of a challenged election law amounts to a cognizable injury. *Common Cause Ind.*, 937 F.3d at 952, 955-56 (discussing injury and causation).

Indeed, Common Cause Indiana expended resources during the November 2018 election to help seek polling-place hour extensions before the Challenged Amendments were in place; the new provisions would require a change in how they advocate for extensions of polling-place hours, including the additional time, expense, and energy necessary to track down county election officials and lobby them to seek an hours extension. Compl. ¶¶ 70, 73; Vaughn Aff. ¶¶ 16, 25; *Common Cause Ind.*, 937 F.3d at 955 (injury present where organizations showed that the potential effect of challenged provision "is already disrupting their operations, and if it goes into effect, it will likely require them significantly to change or expand their activities").

Without question, enjoining the Challenged Amendments would redress the ongoing and future diversion of time and resources caused by their enactment, which otherwise frustrates Common Cause Indiana's core mission of protecting the voting rights of Indiana citizens.  Compl. ¶ 74; Vaughn Aff. ¶ 20.

Common Cause Indiana likewise meets the requirements for associational standing.  Its members, as Indiana voters, Compl. ¶ 75; Vaughn Aff. ¶ 8, would have standing to bring a Section 1983 claim seeking preliminary injunctive relief to prevent imminent violations of their fundamental right to vote caused by the Challenged Amendments.  Its interest in restoring the ability to seek the extension of polling-place hours without the burdens imposed by the Challenged Amendments is directly germane to its voting-rights mission.  Compl. ¶ 76; Vaughn Aff. ¶¶ 3, 5.  And the claims asserted and relief sought by this motion do not require the participation of Common Cause Indiana's individual members.  Compl. ¶ 77.

## ARGUMENT

For the reasons that follow, Common Cause Indiana meets all the requisites for preliminary injunctive relief.

### I.   Common Cause Indiana Is Likely to Succeed on the Merits.

To obtain preliminary injunctive relief, a plaintiff must show "some likelihood of success on the merits" of its claim.  *GEFT Outdoors*, 922 F.3d at 364.  For the reasons that follow, it is *substantially* likely Common Cause Indiana will succeed on the merits of its claims seeking declaratory and injunctive relief on the grounds that the Challenged Amendments place an unconstitutional burden on Indiana voters' fundamental right to vote and violate the Supremacy Clause, and that the Standing Amendment violates Indiana voters' constitutional right to procedural due process.  Common Cause Indiana seeks injunctive relief against state and local

election officials, in their official capacities, who are charged with administering the Indiana

Election Code, including the Challenged Amendments.[9]  The Court should therefore enjoin

Defendants, in their official capacities, from carrying out these unconstitutional laws.

*See Ex Parte Young*, 209 U.S. 123, 159-60 (1908).

### A.   The Challenged Amendments, Separately and Together, Place an Unconstitutional Burden on the Fundamental Right to Vote.

Separately and together, the Challenged Amendments unconstitutionally burden the

fundamental right to vote protected by the First and Fourteenth Amendments to the U.S.

Constitution.  *See Reynolds v. Sims*, 377 U.S. 533, 562 (1964); *Harper v. Va. State Bd. of

Elections*, 383 U.S. 663, 665-67 (1966).  When the constitutionality of a state election law is

challenged, the court must balance the character and magnitude of the burden on voters

exercising their fundamental right to vote against the justifications presented by the state for

imposing such a burden.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*,

460 U.S. 780, 789 (1983) (together, "*Anderson-Burdick*").  "However slight th[e] burden may

appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to

justify the limitation."  *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008)

(Stevens, J., controlling opinion) (internal quotation marks omitted); *accord Tripp v. Scholz*,

872 F.3d 857, 864 (7th Cir. 2017).  Thus, even a slight burden is unconstitutional if there is no

relevant and legitimate justification for its imposition.

---

[9] Plaintiff has named a defendant class of members of Indiana county election boards and has filed a motion to certify such class contemporaneously with the instant motion.  If the Court wishes, it may properly grant Plaintiff's requested preliminary injunction before ruling on Plaintiff's motion for class certification. *See Sherman ex rel. Sherman v. Twp. High Sch. Dist. 214*, 540 F. Supp. 2d 985, 989 (N.D. Ill. 2008) (granting motion to certify a defendant class after having previously issued a preliminary injunction against the named defendants); *Nat'l Broad. Co. v. Cleland*, 697 F. Supp. 1204, 1206 (N.D. Ga. 1988) (granting preliminary injunction against the enforcement of an election-related statute prior to deciding whether to certify proposed defendant class, which court ultimately certified upon deciding on permanent relief); s*ee also Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1377 (N.D. Ga. 2005).

## 1. The Standing Amendment Places an Unconstitutional Burden on the Fundamental Right to Vote of All Indiana Voters.

In stripping voters of the ability to petition a state court for the extension of polling-place hours when their fundamental right to vote is threatened or infringed, and replacing it with a confusing and complicated, multi-step process dependent upon the unanimous consent of their county election board, the Standing Amendment places a severe burden on Indiana voters' constitutional rights.  There is no legitimate governmental interest in imposing such a burden on efforts to secure the fundamental right to vote, much less an interest sufficiently weighty to justify the burden.  The Standing Amendment is, therefore, unconstitutional under *Anderson-Burdick*.

The magnitude of this burden should not be understated.  For voters in need of emergency relief on Election Day in the form of an extension of polling-place hours, the Standing Amendment imposes a multi-step maze, without providing any semblance of a map. Indeed, the Standing Amendment provides no guidance or mechanism for a voter to petition their county election board for relief; no guidance for how to handle an inability to obtain unanimous approval due to the absence or unavailability of a county election board member; and no clear method to challenge a county election board's refusal to convene or to seek an hours extension, even if there is reason to believe that such refusal was based on a partisan or otherwise illegitimate or unlawful reason.

Instead, to the best of Plaintiff's understanding, a voter whose fundamental right to vote may be burdened or denied due to unforeseen polling-place disruptions must conceive of and then complete the following steps to secure an extension of polling-place hours that can ameliorate the constitutional violation befalling them and their community:

(1) identify their county election board members;

(2) determine how to contact those persons or the appropriate support staff for the board;

(3) present relevant and adequate information to the election board;

(4) convince the election board to convene and wait for it to do so;

(5) wait for the board to consider the evidence and make a decision;

(6) hope the decision is unanimously in the voter's favor, despite such a decision amounting to (a) extra work for the board and other election officials, (b) an admission by the board that its own administration of elections is faulty, and, perhaps, (c) a step toward extending polling-place hours in a way that could disadvantage the electoral prospects of the political party with which one or more of the members of the board are affiliated;

(7) wait for the board to retain counsel;

(8) wait for retained counsel to prepare and file a request in state court;[10]

(9) wait for the court to receive, process, and consider the filing;

(10) wait for the court to rule, and, if the court denies the request;

(11) hope that the county election board immediately seeks appellate review.

If this functionally insurmountable process were not burdensome enough, it is all the more untenable given that it must be completed before 6:00 p.m. on Election Day if a court's ruling is to have any practical effect.  Ind. Code § 3-11-8-8.  In sum, the withdrawal of standing to seek an hours extension, the lack of a mechanism to seek relief from a county election board, the inflexible unanimity requirement, and the lack of remedies for improper action by the county election board compound to place a severe burden on Indiana voters' fundamental right to vote.

There is no relevant and legitimate governmental interest sufficient to justify this severe burden on individuals' ability to exercise their fundamental right to vote—*and vindicate* that

---

[10] The Remedies Amendment requires that the county election board also file written notice with the Secretary of State and the Indiana Election Division indicating that the county election board filed an action in state court *and* that the state court received the filings.  Ind. Code. § 3-11.7-7-3(a)(6).

right, when necessary, through recourse to Indiana courts.[11]  For years, Indiana elections proceeded without the Standing Amendment's restrictions, allowing voters to seek relief in state court when the franchise was threatened.  Absent a justification—much less a "sufficiently weighty" one—the burden imposed by the Standing Amendment is unconstitutional, and the provision should be enjoined.  *See Crawford.*, 553 U.S. at 191; *Tripp*, 872 F.3d at 864.

While the Standing Amendment imposes an unconstitutionally severe burden on the fundamental right to vote of all Indiana voters, its effect is magnified on voters of color and voters who reside in Lake and Porter Counties.  Compl. ¶¶ 57-62.  Voters of color are statistically more likely to experience polling-place disruptions generally, including those resulting in longer wait times, and are less likely to be able to successfully cast a ballot in the

---

[11] Testimony by Defendant King before the Indiana Senate Committee on Elections during consideration of the Challenged Amendments suggests that Defendants may argue that voters can seek extensions of polling-place hours in federal court or that the federal Help America Vote Act of 2002 ("HAVA") required Indiana to create a statutory process for the extension of polling-place hours.  *2019 Archived Video, Elections, Meetings (Monday, Feb. 4 - 10:00 a.m.)*, Indiana General Assembly (2019 Session), at 59:49, 102:23, *available at* http://iga.in.gov/information/archives/2019/video/committee_elections_3500/.  Such justifications are inaccurate and insufficient.

Defendants may not rely on the ability of a voter to bring a constitutional claim in federal court under Section 1983, seeking an extension of polling-place hours, to justify the severe burden imposed by the Standing Amendment on voters' fundamental right to vote.  The Court should reject any such reliance as a matter of law for two reasons.  First, for the reasons explained in Section I.C., *infra*, the Supremacy Clause of the U.S. Constitution does not permit the State of Indiana to strip its state courts of only a subspecies of Section 1983 claims—regardless of the availability of a federal forum to hear similar claims.  The Court should not permit Defendants to plead that there is no harm in blocking voters from bringing Section 1983 claims in state court because they can still bring them in federal court, because the Supreme Court has held precisely such a "blocking" maneuver to be unconstitutional.  Clearly, an unconstitutional statutory regime cannot justify an unconstitutional burden.  Second, regardless of Section 1983, the Standing Amendment still precludes a voter from bringing an action in state court when an hours extension is warranted based on a violation of *state* statute or the Indiana Constitution, rather than the U.S. Constitution (*e.g.*, failure to abide by Ind. Code § 3-11-8-8, requiring polls to be physically open from 6:00 a.m. to 6:00 p.m.).  In general, a voter cannot ask a federal court to require state officials to enforce state law, even where a voter also has a federal claim.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).  For that reason, the Standing Amendment could leave a voter with *no remedy in either state or federal court* if a state election official is in plain violation of state law.  That is indisputably a severe burden on the exercise of the fundamental right to vote.

As to the HAVA argument, the only conceivably relevant part of HAVA requires only that ballots cast pursuant to a court order extending polling-place hours be cast as provisional ballots.  52 U.S.C. § 21082(c).  Indiana satisfied this particular federal requirement long before the Election Code was amended in 2019.  Ind. Code § 3-11.7-2-1(a)(3).  HAVA does not require stripping voters of the right to petition for an extension of polling-place hours or the withdrawal of discretion for state-court judges to extend hours absent a physical closure.

face of these longer wait times without an extension of polling-place hours.  Compl. ¶¶ 57, 59; Meredith Decl. ¶¶ 17, 24, 26, 27.  Accordingly, the burden on the fundamental right to vote imposed by the Standing Amendment is even heavier on voters of color.  Moreover, voters who reside in Lake and Porter Counties, where the county election boards comprise five members rather than three, are more severely burdened by the Standing Amendment based on nothing more than their county of residence.  In order to obtain an extension of polling-place hours to prevent disenfranchisement, voters in Lake and Porter Counties must locate, lobby, and convince two more officials than their fellow Indiana citizens.  For these voters, the nearly insurmountable burden imposed on voters in Indiana's other 90 counties is ratcheted up even higher, and the danger of a partisan or otherwise illegitimate refusal by a county election official to support an hours extension is likewise increased.  For the reasons described above, voters of color in these two counties—who constitute 46% of Lake County residents and 17% of Porter County residents—are burdened even more.

As observed by a court in this district, Supreme Court jurisprudence suggests that a burden on the fundamental right to vote is considered more severe when it disproportionately affects an identifiable class of voters—especially when it falls along lines of suspect classifications, such as race or wealth—and therefore requires a greater state interest to justify its effect.  *See Common Cause Ind. v. Marion Cty. Election Bd.*, 311 F. Supp. 3d 949, 968-69 & n.18 (S.D. Ind. 2018), *vacated on other grounds by Common Cause Ind. v. Marion Cty. Election Bd.*, 925 F.3d 928 (7th Cir. 2019) (identifying six–Justice majority in *Crawford*, 553 U.S. 181, supporting the proposition that disparate impact "matters" in the *Anderson–Burdick* analysis); *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018); *see also Anderson*, 460 U.S. at 793 (finding it "especially difficult" for state to justify restrictions

where effects are unevenly distributed among groups).  Because the Standing Amendment is
unconstitutional on its face based on the burden it imposes on all Indiana voters, the Court need
not decide whether the irrefutably disparate impacts the Standing Amendment has on voters of
color and voters who reside in Lake and Porter Counties compound its unconstitutionality.  The
heightened burdens imposed by the Standing Amendment on these identifiable groups of voters,
however, cannot be denied or in any way justified by the State.

### 2.  The Remedies Amendment Places an Unconstitutional Burden on the Fundamental Right to Vote of All Indiana Voters.

The severe limitations imposed by the Remedies Amendment on state courts' authority to
extend polling-place hours for a reason other than physical closure of or a delay in opening the
polls—such as malfunctioning of equipment, lack of poll workers, lack of adequate ballots, or
unreasonably long lines—also places an unconstitutional burden on the fundamental right to
vote.  Under the Remedies Amendment, when these circumstances now arise in Indiana, voters
who cannot stay in line and cannot return by 6:00 p.m. will have no available remedy under state
law.  Indeed, even if the Standing Amendment remains in place, the Remedies Amendment
would prevent a unanimous county election board from petitioning a state court to protect its
constituents' fundamental right to vote in the event of non-closure conditions resulting in
disenfranchisement.  There is no legitimate governmental interest to justify so strictly limiting
the instances in which state law permits the extension of polling-place hours.

The Remedies Amendment provides that a state court must "limit the extension only to
those polls whose opening was delayed or which closed" between 6:00 a.m. and 6:00 p.m., and
may "extend the hours for the polls at the precinct or vote center for a period of time not more
than the time that the polls were closed" during such hours.  Ind. Code § 3-11.7-7-4.  The state
court may offer this limited relief only if it makes *six* statutorily required findings, including the

circumstances surrounding a polling-place closure (or delayed opening), substantial evidence that voters were prevented from casting a ballot, the absence of any remedy other than an hours extension, and proof that the county election board informed the Secretary of State and the Indiana Election Division of both the court action *and* the court's receipt of the election board's filings.  Ind. Code § 3-11.7-7-3.  These significant restrictions on state courts' authority to extend polling-place hours impose an unconstitutional burden on all Indiana voters by foreclosing relief from polling-place conditions that have the functionally equivalent effect of a physical closure.[12]

One need look no further than Indiana's November 2018 election to see the perverse effect of the Remedies Amendment.  In Monroe County, no polling place officially "closed" between the hours of 6:00 a.m. and 6:00 p.m., but as many as half of all polling places ran out of ballots due to heavy voter turnout, resulting in long lines that turned some voters away.  Compl. ¶ 31.  Extending polling-place hours past 6:00 p.m. was, for some of these voters, the only way they could return in time to exercise their fundamental right to vote.  Likewise, in Johnson County, equipment and server malfunctions caused some voters to have to wait in line for as many as four hours but did not result in a single polling place "closing" for any period of time.  Compl. ¶ 29.  If upheld, the Remedies Amendment will bar state courts from extending polling-place hours in future elections when conditions such as these recur.  The burden such a regime imposes on Indiana voters' fundamental right to vote is clear.[13]

---

[12] As with the Standing Amendment, the Remedies Amendment has a disproportionately burdensome effect on voters of color.  Because such voters experience disruptions and long waits at polling places at a higher rate than other voters, Compl. ¶¶ 57, 59; Meredith Decl. ¶¶ 17, 24, 26, 27, limiting their access to extensions of polling-place hours only entrenches the extra difficulty these communities experience when trying to exercise their fundamental right to vote.

[13] Polling-place disruptions that necessitate the extension of voting hours are particularly likely in the upcoming 2020 General Election due to election administration challenges related to the COVID-19 pandemic, which is likely to persist and even intensify into the fall.  Compl. ¶ 68.

More broadly, data and political science confirm that disenfranchising conditions at polling places can deprive a voter of the fundamental right to vote even where a polling place is not physically closed.[14]  Meredith Decl. ¶¶ 22, 30-37.  One of the most prevalent such conditions is long wait times, which may be caused by breakdowns in election administration—such as equipment malfunctions, ballot shortages, or insufficient poll workers—or uncontrollable events, such as inclement weather, heavy traffic, or security threats.[15]  *Id.* at ¶¶ 22, 28, 31-32.  The longer a voter is required to wait in line, the more likely the cost of voting will exceed the voter's ability to cast a ballot.  *Id.* at ¶¶ 12, 16-20.  Some voters will get in line but depart their polling place before casting a ballot because they can no longer wait (referred to by political scientists as "reneging"); others may see the line and determine that they cannot even make an attempt.  *Id.* at ¶¶ 18-20, 37.  The disenfranchising effect of long lines at polling places is statistically more burdensome on voters in Indiana than those in many other states.  Data from the 2016 presidential election demonstrates that, on average, Indiana voters experience longer wait times than voters in other states and were doubly likely (14%) to wait thirty minutes or more when compared to the nation as a whole (7%).  *Id.* at ¶ 29.

Specific features of Indiana law[16] also enhance the burden of conditions at polling places that cause long lines or other disenfranchising effects.  Meredith Decl. ¶¶ 38-55.  Indiana is one of only three states whose polls close at 6:00 p.m.—all others' are open later.  *Id.* at ¶ 40.

---

[14] In Indiana, counties use two models to run elections: the vote center model and the traditional precinct model; both models are susceptible to the disenfranchising conditions discussed here.  Meredith Decl. ¶¶ 34-36.

[15] Weather, traffic, and security-related problems could also make *accessing* an open polling place impossible for voters trying to reach their voting site before polls close.  Courts have extended polling-place hours in such situations.  Meredith Decl. ¶ 22(j), (k).  The Remedies Amendment would not allow for such commonsense relief.

[16] While Plaintiff does not challenge these features of Indiana law here, their effects bear on the burden imposed by the Remedies Amendment.

Indiana law also does not ensure employees time off to vote or permit no-excuse absentee voting.[17]  *Id.* at ¶¶ 41-42.  Thus, polling-place conditions that result in long wait times in the morning are especially problematic for Indiana voters who work or have other commitments that last into the early evening because such voters must be back in line by 6:00 p.m.[18]  *Id.* at ¶¶ 40, 44-50.  Even if such a voter's shift ends at 5:00 p.m., a lengthy commute or daycare pick-up responsibilities could make it nearly impossible for them to return to the polls on time.[19]  *Id.* at ¶¶ 40-41, 43.  In short, a working voter—or any voter who experiences a polling-place disruption during the course of the day—is more likely to be able to return to vote if polling places are open past 6:00 p.m.  *Id.* at ¶¶ 20, 51-55.  In Indiana, that requires an extension of polling-place hours that, absent a physical closure, the Remedies Amendment forbids.  This burden is unreasonable, ill-considered, and a clear infringement of such voters' fundamental right to vote.

Ultimately, because there is no difference in effect between disenfranchisement caused by a late opening or official closure and disenfranchisement caused by other conditions, such as equipment malfunctions, ballot shortages, or any other problem resulting in long wait times, there can be no legitimate state interest in revoking a state court's authority to extend polling-place hours in one case but not the other.  Without a relevant and legitimate state interest sufficiently weighty to justify the burden imposed by the Remedies Amendment, the provisions cannot survive the *Anderson-Burdick* analysis and must be struck down.

---

[17] Any temporary relaxation of the no-excuse absentee ballot rules during the COVID-19 pandemic does not alter the analysis of whether the Challenged Amendments are constitutional.  Meredith Decl. ¶ 43.

[18] Indiana voters with work commitments are statistically more likely to vote in the morning when compared to working voters in states whose polls are open long enough for a voter to plan to vote after work. Meredith Decl. ¶¶ 47, 51-55.

[19] The problem would be even worse for a voter whose job is located in the portions of Indiana that recognize Central Standard Time, but whose polling place is on the other side of the time zone border.  For a voter in this situation, their polling place would close simultaneously with the 5:00 p.m. end of their work day. Meredith Decl. ¶ 40.

### 3.  The Challenged Amendments Together Place an Unconstitutional Burden on the Fundamental Right to Vote of All Indiana Voters.

For the reasons described in the preceding sections, the combined effect of the Challenged Amendments imposes an unconstitutionally severe burden on the fundamental right to vote.  The Standing Amendment erects an unconstitutional barrier to voters petitioning a state court to vindicate their right to vote by extending polling-place hours, and the Remedies Amendment forecloses voters' ability to secure their right to vote when it is being infringed for any reason other than the specific, unduly narrow reasons authorized by the statute.  Each of these burdens is severe on its own.  Together, these burdens combine to establish an almost impenetrable barrier to voting whenever a voter cannot wait in long lines resulting from polling-place disruptions and cannot return to their polling place before it closes at 6:00 p.m.  There is no relevant and legitimate governmental interest sufficiently weighty to justify the burdens on the fundamental right to vote imposed by the Challenged Amendments.

Moreover, considering the Challenged Amendments in the context of "the whole electoral system," no other provision or aspect of the Indiana Election Code eliminates or even reduces the harm to voters that results from disenfranchising conditions at polling places on Election Day.  *See Luft v. Evers*, No. 16-3003, 2020 WL 3496860, at *3 (7th Cir. June 29, 2020) (citing *Burdick*, 504 U.S. at 434, 439).  In-person voting on Election Day is an integral part of our electoral system, and voters reasonably rely on its availability.  For those who choose this option and are faced with an unanticipated barrier at their voting location, it is too late for them to fall back on other means of casting their vote, such as applying for an absentee ballot or voting early.  Absent emergency judicial relief in the form of an hours extension, such voters are out of luck—they have no other recourse to exercise their fundamental right to vote.

Finally, striking one of the challenged provisions but not the other would provide little relief from the unconstitutional burden they impose.  If the Standing Amendment is struck, but the Remedies Amendment remains, the Remedies Amendment could be invoked to dismiss any action brought by a voter seeking an hours extension by observing that the voter did not (*indeed could not*) satisfy the requirement that the "county election board filed written notice" of the action with the Secretary of State and the Indiana Election Division; election officials could also move to dismiss any such action that is premised on disenfranchising conditions other than physical closure.  If the Remedies Amendment is struck but the Standing Amendment remains, then lifting the onerous restrictions on courts' discretion to extend hours at polling places that have not been physically closed would provide no cure to individual voters' inability to seek extensions directly; the only way forward would be traversing the burdensome, if not inevitably futile, path required under the Standing Amendment.  In short, the Challenged Amendments work in tandem to severely burden the fundamental right to vote, and both must be enjoined.

### B.  The Standing Amendment Violates Procedural Due Process.

By stripping Indiana voters of the right to be heard in state court when a governmental deprivation of their fundamental right to vote requires the extension of polling-place hours, the Standing Amendment deprives Indiana voters of their constitutional right to due process of law.  The Standing Amendment vests sole discretion to vindicate voters' fundamental right to vote in county election boards—the very governmental entity responsible for administering elections and ensuring that extensions of polling-place hours are not necessary in the first place.  Potential violations of county election boards' duty to afford all eligible voters the ability to cast their ballot during normal polling hours may therefore be effectively immunized from judicial review in state court.  In short, this regime amounts to a paradigmatic example of the fox guarding the

henhouse.  The U.S. Constitution requires more process than that before a voter's fundamental rights are denied.

The Fourteenth Amendment requires that any deprivation by the government of a citizen's constitutionally protected liberty or property interest be accompanied by constitutionally adequate due process.  *Knutson v. Vill. of Lakemoor*, 932 F.3d 572, 576 (7th Cir. 2019).  The fundamental right to vote is a constitutionally protected liberty interest.  *E.g.*, *Worley v. Waddell*, 819 F. Supp. 2d 826, 831 (S.D. Ind. 2011).  Maladministration of elections, closures of polling places, or polling-place malfunctions causing Indiana voters to be unable to cast ballots absent an extension of polling-place hours amounts to a deprivation of their fundamental right to vote.

At its core, constitutionally adequate due process amounts to the right to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))).  While a procedural due process analysis typically requires careful balancing of procedural mechanisms available to the injured party against the value of additional process and the burden on the government, *e.g.*, *Mathews*, 424 U.S. at 335, such analysis is unnecessary here because the Constitution does not tolerate the complete elimination of the right to be heard.  *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 184 (5th Cir. 2011), *as revised* (June 9, 2011) ("[W]e need not examine the [Eldridge] factors in detail, because the district court gave the press and public no notice, and no opportunity to be heard, whatsoever."); *Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005) ("[A]lthough the Court has crafted a nice balancing test to determine what such a hearing should look like, we need not consider that test here because the Rawlins derelict vehicle ordinance provides no

hearing whatsoever."); *Hathaway v. Mathews*, 546 F.2d 227, 232 (7th Cir. 1976) (government cannot deny Medicaid benefits in absence of pre- or post-termination hearing).[20]

The Standing Amendment deprives Indiana voters of any opportunity to be heard in state court before they are deprived of their fundamental right to vote by conditions that would be remediable by an extension of polling-place hours.  That alone is unconstitutional.  What is worse, even if outsourcing voters' right to be heard to their county election officials were constitutionally permissible, the Indiana Legislature has provided no guidance or mechanism for citizens to petition their county election boards to assemble, consider the need for the extension of polling hours, unanimously vote in favor of legal action, and file a motion in state court for an extension of polling hours.  Nor do the 2019 Amendments provide any failsafe ability for voters to bring legal action to extend hours if they encounter a county election board that is unable to meet or that refuses to seek an extension for a partisan or otherwise unlawful reason.  *Cf. Toney v. Burris*, 881 F.2d 450, 454 (7th Cir. 1989) (concluding that "opportunity for access to the full range of procedural protections" before one state agency foreclosed the need to provide similar procedural protections before second state agency tasked with carrying out findings of the first state agency).

The Standing Amendment's constitutional infirmity is compounded by the fact that it does not even outsource voters' due process rights to a neutral third party, like a state court. Rather, it vests the very public officials responsible for administering elections with sole authority and discretion to seek an extension of polling-place hours.  A voter's right to obtain such an hours extension should not depend on the unanimous consent of those who, for whatever

---

[20] While the Seventh Circuit has cabined the reach of *Hathaway*, it still stands for the proposition that the lack of any hearing is incompatible with one's constitutional right to procedural due process.  *See Americana Healthcare Corp. v. Schweiker*, 688 F.2d 1072, 1083 (7th Cir. 1982); *Town Court Nursing Ctr., Inc. v. Beal*, 586 F.2d 266, 278 n.7 (3d Cir. 1978).

reason, were unable to provide access to polling places during normal polling hours.  It goes without saying, of course, that if a rogue county election board (or member) intentionally or negligently causes disenfranchising conditions at a polling location, giving them veto power over any state-court action to remedy that harm is preposterous.  But the Standing Amendment misaligns the incentives of voters and county election boards regardless of why a polling place warrants an extension.  For example, seeking any such extension requires a unanimous board to be willing to incur the administrative burdens associated with requiring poll workers and other election officials to work longer hours on Election Day.  Moreover, for some members of a given board, the decision to authorize a state-court action to extend hours may result in political and occupational harm should the political party that appointed them to their position view extending hours at affected sites to be detrimental to the party's electoral prospects.  And if polling place disruptions are caused by poor administration of the election, voters' remedy is contingent upon their county officials' willingness to recognize their own failure in administering the election and to incur the reputational harm of publicly acknowledging such failure by filing a lawsuit.

This codification of a conflict of interest is constitutionally impermissible.  It simply cannot be that voters' due process is satisfied where the would-be defendant in an action to prevent disenfranchisement is also *the only statutorily authorized plaintiff* to pursue such an action in state court.  On the contrary, procedural due process under the U.S. Constitution requires that "wielders of governmental power must be subject to the limits of law, and . . . the applicable limits should be determined, not by those institutions whose authority is in question, but by an impartial judiciary."  *Marozsan v. United States*, 852 F.2d 1469, 1478 n.18 (7th Cir. 1988) (en banc) (quoting Fallon, *On Legislative Courts, Administrative Agencies, and Article III*, 101 Harv. L. Rev. 916, 938 (1988)).  The Standing Amendment allows county election boards

the sole ability to self-police their administration of the franchise, thus immunizing them from state-court oversight if they fail to provide voters constitutionally-adequate access to polling places during normal poll hours.  This regime would permit a deprivation of the right to vote that is unreviewable in state court.  A law that has the effect of stripping courts of the ability to review the constitutionality of a government agency's actions "must be just as unconstitutional as the underlying action of the Administrator."  *Id.* at 1478.

### C.  The Challenged Amendments Violate the Supremacy Clause.

The Supremacy Clause of the United States Constitution does not permit states to strip their courts of jurisdiction to consider or authority to provide relief pursuant to a specific subset of claims brought under a federal statute that the state courts otherwise enforce.  Specifically, once a state makes "the decision to create courts of general jurisdiction that regularly sit to entertain" Section 1983 claims, state law may not divest its courts of jurisdiction to hear "only a particular species of [such] suits."  *Haywood v. Drown*, 556 U.S. 729, 739-40 (2009).  While Indiana courts regularly consider claims brought under Section 1983, the Standing Amendment eliminates state courts' ability to adjudicate such cases when the constitutional violation at issue is the fundamental right to vote, the remedy sought is prospective injunctive relief in the form of a polling-place hour extension, and the plaintiff is any person or entity other than a county election board.  Likewise, the Remedies Amendment withdraws state courts' authority to provide a species of injunctive relief available under Section 1983: extending polling-place hours due to disenfranchising conditions afflicting a polling place other than physical closure of the site.  This selective closure of state courthouse doors to claims under Section 1983 renders the Challenged Amendments constitutionally untenable.

In *Haywood*, the Supreme Court struck down a New York state law that stripped New York's trial courts of jurisdiction to consider damages claims brought by prisoners against correction officers under Section 1983, while leaving intact the state judiciary's authority to consider other types of Section 1983 claims.  556 U.S. at 739-42.  The Court concluded that, while states generally have broad authority to define the jurisdiction of their courts, such authority "remains subject to the strictures of the Constitution," and laws evincing an effort to limit the adjudication of Section 1983 claims against particular defendants operate "effectively [as] an immunity statute cloaked in jurisdictional garb," inconsistent with the Supremacy Clause. *Id.* at 740-42.

The Standing Amendment suffers the same, fatal constitutional infirmity.  Indiana state courts are courts of general jurisdiction that regularly exercise jurisdiction over claims for prospective injunctive relief brought pursuant to 42 U.S.C. § 1983.  *E.g.*, *Severson v. Bd. of Trustees of Purdue Univ.*, 777 N.E.2d 1181, 1194 (Ind. Ct. App. 2002).  Yet the Standing Amendment strips Indiana state courts of jurisdiction to consider any "action or petition to request the extension of the hour for closing the polls," unless such action or petition is brought by a county election board.  Ind. Code § 3-11.7-7-2(a).  It therefore strips Indiana courts of jurisdiction to consider Section 1983 claims premised on a violation of a voter's fundamental right to vote in which the voter—or any movant other than a county election board—seeks prospective injunctive relief, in the form of an extension of polling-place hours, against election officials.

Thus, like the New York statute at issue in *Haywood*, the Standing Amendment is a "unique scheme adopted by the State of [Indiana] . . . designed to shield a particular class of defendants ([state election officials]) from a particular type of liability ([injunctive relief to

extend polling-place hours in the wake of a violation of the fundamental right to vote]) brought by a particular class of plaintiffs ([anyone other than county election boards]).”  *Haywood*, 556 U.S. at 741-42.  This regime is “effectively an immunity statute cloaked in jurisdictional garb.” *Id.* at 742.   Having “create[d] courts of general jurisdiction that regularly sit to entertain analogous suits,” Indiana law violates the Supremacy Clause by singling out “only a particular species of suits—those seeking [prospective injunctive] relief against [election officials]” as jurisdictionally “inappropriate for its trial courts.”  *Id.* at 739-740.[21]

Consistent with *Haywood*, the Remedies Amendment also runs afoul of the Supremacy Clause.  The Remedies Amendment limits a state court’s authority to extend polling-place hours to “polls whose opening was delayed or which closed during the hours set” for voting by state law.   Ind. Code § 3-11.7-7-4(a).  In contrast, Section 1983 permits a court to provide prospective injunctive relief in the form of an extension of polling-place hours to remedy a burden on the fundamental right to vote—whether caused by the physical closure of a polling place or some other disenfranchising condition.  The Remedies Amendment is therefore unconstitutional because it withdraws from state courts a specific remedy otherwise available under federal law.

---

[21] As explained in Section I.A., *supra*, not every instance in which an extension of polling-place hours is warranted will be premised on a constitutional violation remediable via a Section 1983 claim.  But the Supremacy Clause requires Indiana courts to remain open to such claims when state law is insufficient to protect the fundamental right to vote—or even actively infringes the right.  Here, the need is especially acute in light of the Remedies Amendment, which restricts Indiana state courts’ authority to extend polling-place hours to a set of circumstances that fails to fully protect the right to vote enshrined in the U.S. Constitution.  An injunction issued by the U.S. District Court for the District of Idaho in 2016 is instructive.  *Idaho State Democratic Party v. Rich*, Case No. 16-cv-491-BLW (D. Idaho), ECF Nos. 1, 2-1, 7.  There, while local officials complied with the letter of the Idaho Election Code, they failed to give reasonable notice of changes of polling-place locations, leading certain voters who arrived at their usual voting location to be at risk of losing the ability to vote because they could not locate their new site before the polls were set to close.  The district court granted an hours extension based on a violation of the U.S. Constitution, pursuant to Section 1983.  The Remedies Amendment would have precluded such relief under Indiana state law, but *Haywood* requires Indiana state courts—as well as Indiana’s federal courts—to be available for a voter to pursue a Section 1983 claim, unfettered by the severe restrictions of the Remedies Amendment, in a similar situation.

II.     **Absent an Injunction, Common Cause Indiana, and Its Members, Are Threatened by Irreparable Harm With No Adequate Remedy at Law.**

Having demonstrated a substantial likelihood of success on the merits of its constitutional claims, Common Cause Indiana easily satisfies the remaining elements of the preliminary injunction standard.  Irreparable harm is presumed for violations of First Amendment rights, *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011), and many courts have concluded explicitly that restrictions on the right to vote constitute irreparable injury, *see League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1155 (S.D. Ind. 2018); *Ind. State Conference of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018).  Moreover, money damages are an inadequate remedy for disenfranchisement caused by an unconstitutional burden on the fundamental right to vote and/or the denial of constitutional due process prior to the abridgement of the same.  *See Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (describing an inadequate remedy at law as one "seriously deficient as compared to the harm suffered").

Both Challenged Amendments will force the irretrievable diversion of precious time and resources by Common Cause Indiana to training its volunteers on the amendments' effects and, on Election Day, tracking down and lobbying county election board members to seek extensions of polling-place hours.  Vaughn Aff. ¶¶ 21-26.  Spending such time and resources on the consequences of the Challenged Amendments' will be to the detriment of other voter-protection efforts Common Cause Indiana already undertakes in every statewide election.  *Id.*  Indeed, the Challenged Amendments have already forced Common Cause Indiana to allocate time and

resources to combatting the effects of the Challenged Amendments at the expense of other important voting-rights work central to its mission.  *Id.* at ¶¶ 10-11, 19.

Money damages cannot make up for the irreparable harm to Common Cause Indiana's mission of protecting voters' access to the ballot, generally, and to providing assistance to Indiana voters on Election Day, specifically.  *See Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1154-55 (S.D. Ind. 2018), *aff'd* 937 F.3d 944 (7th Cir. 2019).  Moreover, an Indiana voter—including any member of Common Cause Indiana—who has been unable to vote on Election Day because of barriers to the polls will never be able to exercise their political voice in that election, regardless of the ultimate outcome of a related legal challenge.  *See League of Women Voters of N.C.*, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress."); *Common Cause Ind.*, 327 F. Supp. 3d at 1155 ("Because an individual cannot vote after an election has passed, it is clear that the wrongful disenfranchisement of a registered voter would cause irreparable harm without an adequate remedy at law.").

When demonstrating irreparable harm, plaintiffs do not need to show that harm actually has occurred, or even that harm is certain to occur, before being granted preliminary relief. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044-45 (7th Cir. 2017); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).  Rather, plaintiffs need show only that the harm "cannot be prevented or fully rectified by the final judgment after trial."  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of Am. Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)) (internal quotation marks omitted); *accord Whitaker*, 858 F.3d at 1045. Common Cause Indiana meets this burden.

28

First, the injuries described above are hardly hypothetical; the court orders extending polling-place hours in Monroe and Porter Counties in November 2018 make clear that such orders are necessary to prevent the denial of the fundamental right to vote, which is incapable of remedy once the selection of elected officials has been completed.  For the November 2020 election, the potential effects of the COVID-19 pandemic compound the risk.  If the State of Indiana applies similar measures to combat the pandemic in November, the reduction of the number of polling places, limits on the number of voters permitted inside a polling place at a given time, and the need for extraordinary disinfection measures only add to the likelihood of voters facing additional obstacles.  The risk of such obstacles is especially acute for voters who reside in communities of color, which experience infection rates up to three times higher than majority-white communities.  Compl. ¶ 68.

Second, in any statewide election, it is "virtually inevitable" that some polling places will experience complications resulting in physical closures or non-closure conditions that result in disenfranchisement.  Meredith Decl. ¶¶ 21-23, 27, 28.  Thus, it is also "virtually inevitable" that, absent an injunction, Common Cause Indiana and its members will suffer the irreparable harms described above.  Indeed, the particulars of Indiana's electoral system, *id.* at ¶¶ 38-42, the disproportionate prevalence of long lines at polling places in Indiana as compared to the rest of the country, *id.* at ¶ 29, and the higher frequency of disenfranchising conditions at polling places in communities of color, *id.* at ¶¶ 16, 24, 26, 27, make the threat of injury all the more profound.

If left in force, the Challenged Amendments thus threaten irreparable injuries incapable of being "prevented or fully rectified by the final judgment after trial"—*i.e.*, after Election Day, when the votes will have been tallied, public officials selected, and public interest organizations' time and resources expended.  *Girl Scouts*, 549 F.3d at 1089.  Instead, enjoining the operation of

the Challenged Amendments so that voters can pursue the commonsense remedy of hours extensions is the only means to avoid irreparable injury.  Meredith Decl. ¶¶ 20, 43 ("[E]xtending polling-place hours can prevent disenfranchisement in Indiana when issues with the voting process at a polling place cause reneging among would-be voters who find it prohibitively costly to get back into line by 6:00 p.m.").

### III.   The Balance of Harms Tips Decisively in Favor of Common Cause Indiana and Its Members.

Determining the balance of harms is simple because, absent an injunction, Plaintiff and its members will suffer the significant injury of the violation of their constitutional rights and—in certain instances—the irremediable actual loss of their ability to cast a ballot in the November election; Defendants, by contrast, will face no harm whatsoever if the injunction is granted. *See GEFT Outdoors*, 922 F.3d at 364 (defining balancing test as weighing the "harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction"). Where, as here, the likelihood of success on the merits is substantial, a preliminary injunction is warranted even if the balance of harms tilts "less heavily" in the movant's favor.  *Id.*  That discount is unnecessary in this case, however, because the balance of harms tips decisively in favor of enjoining the Challenged Amendments.

Far from harming Defendants, enjoining the Challenged Amendments would simply return Indiana elections to the status quo from prior elections—allowing voters to seek extensions of polling-place hours to address closures and other problematic conditions afflicting polling places on Election Day.  As before, each such case—and the propriety of an hours extension—would be adjudicated by Indiana courts based on its specific facts.  Defendants' interest in maintaining order in its election process will not be harmed by enjoining the Challenged Amendments.  *E.g.*, *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC,

2020 WL 1638374, at *13 (W.D. Wis. Apr. 2, 2020).  Defendants have for decades run statewide elections without the Challenged Amendments' unconstitutional restrictions in place; reverting to the very procedures in effect during the most recent nationwide election cannot be considered *any* harm to the Defendants, much less one that overcomes the unconstitutional burdens placed on voters by the Challenged Amendments.[22]

## IV.     The Public Interest Clearly Favors the Fundamental Right to Vote.

The public interest clearly favors enjoining the Challenged Amendments to preserve the fundamental right to vote for all Indiana voters.  *See Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019) ("Enforcing a constitutional right is in the public interest."); *Girl Scouts*, 549 F.3d at 1086 (7th Cir. 2008) (observing that the public interest requires considering the effects of a preliminary injunctive relief on nonparties).  In considering preliminary injunctive relief, courts have made clear that "the public has a 'strong interest in exercising the fundamental political right to vote.'"  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).  The public interest thus favors "'ensuring that qualified voters' exercise of their right to vote is successful'" and "permitting as many qualified voters to vote as possible."  *Id.* at 436 (quoting *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011)); *accord Democratic Nat'l Comm.*, 2020 WL 1638374, at *14.  As the Supreme Court has observed: "the possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges."  *Purcell*, 549 at 4.

---

[22] Arguably, an injunction will only *enhance* Indiana's ability to run free and fair elections by providing the means for those affected by any problems to remedy them through the state courts.

Here, the Challenged Amendments imperil the ability of qualified voters to exercise their right to vote successfully.  Enjoining the Challenged Amendments preserves Indiana voters' constitutional right to vote by protecting their ability to seek and obtain redress for barriers imposed on the franchise, whether in the form of physical closures or other conditions resulting in disenfranchisement.  Moreover, as explained above, the disproportionate prevalence of disenfranchising conditions at polling places in communities of color renders voters of color especially susceptible to the Challenged Amendments' effects.  Granting preliminary injunctive relief therefore reduces "the possibility that qualified voters might be turned away from the polls" and increases the likelihood that as many qualified voters as possible will be able to cast their ballots.

## CONCLUSION

For the foregoing reasons, Common Cause Indiana requests that, before the November 3, 2020 General Election, the Court preliminarily enjoin Defendants and members of the defendant class from implementing, enforcing, administering, invoking, or giving any effect to Indiana Code §§ 3-11.7-7-2, 3-11.7-7-3, and 3-11.7-7-4 , and that the Court further enjoin Defendants Okeson, Long, Wilson Overholt, and Klutz, in their official capacities as members of the Indiana Election Commission and pursuant to the duties of the Indiana Election Commission as defined in Ind. Code § 3-6-4.1-14, to adopt rules, or emergency rules, requiring election officials across Indiana not to implement, enforce, administer, invoke, or give any effect to the Challenged Amendments.

Dated: July 8, 2020                         Respectfully submitted,

                                            */s/ Gregory M. Schweizer*
                                            Gregory M. Schweizer
                                            Brent R. Austin (*pro hac vice forthcoming*)
                                            Sarah Kinter (*pro hac vice forthcoming*)
                                            EIMER STAHL LLP
                                            224 South Michigan Avenue
                                            Suite 1100
                                            Chicago, IL 60604
                                            (312) 660-7648 (tel.)
                                            (312) 692-1718 (fax)
                                            gschweizer@eimerstahl.com
                                            baustin@eimerstahl.com
                                            skinter@eimerstahl.com

                                            Aneel L. Chablani (*pro hac vice forthcoming*)
                                            Ami Gandhi (*pro hac vice forthcoming*)
                                            Jennifer Terrell (*pro hac vice forthcoming*)
                                            Chicago Lawyers' Committee for Civil Rights
                                            100 North LaSalle Street
                                            Suite 600
                                            Chicago, IL 60602
                                            (312) 888-4191 (tel.)
                                            (312) 630-1127 (fax)
                                            achablani@clccrul.org
                                            agandhi@clccrul.org
                                            jterrell@clccrul.org

                                            Ezra Rosenberg (*pro hac vice forthcoming*)
                                            Bradley Phillips (*pro hac vice forthcoming*)
                                            Ryan Snow (*pro hac vice forthcoming*)
                                            Lawyers' Committee for Civil Rights Under Law
                                            1500 K Street NW
                                            Suite 900
                                            Washington, DC 20005
                                            (202) 662-8600 (tel.)
                                            (202) 783-0857 (fax)
                                            erosenberg@lawyerscommittee.org
                                            bphillips@lawyerscommittee.org
                                            rsnow@lawyerscommittee.org

                                            *Attorneys for Common Cause Indiana*

33

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2020, the foregoing was filed electronically with the Clerk of this Court via the ECF system.

I further certify that a copy of the foregoing will be sent to the following parties by Certified U.S. Mail, with a return receipt requested, pursuant to Fed. R. Civ. P. 4 and Ind. R. Civ. P. 4.

Dated: July 8, 2020
                              */s/ Gregory M. Schweizer*
                              Gregory M. Schweizer

| | |
|---|---|
| Connie Lawson<br>Office of the Indiana Secretary of State<br>200 W. Washington St., Room 201<br>Indianapolis, IN 46204 | Paul Okeson<br>Indiana Election Commission<br>302 W. Washington St., E204<br>Indianapolis, IN 46204 |
| S. Anthony Long<br>Indiana Election Commission<br>302 W. Washington St., E204<br>Indianapolis, IN 46204 | Suzannah Wilson Overholt<br>Indiana Election Commission<br>302 W. Washington St., E204<br>Indianapolis, IN 46204 |
| Zachary E. Klutz<br>Indiana Election Commission<br>302 W. Washington St., E204<br>Indianapolis, IN 46204 | J. Bradley King<br>Co-Director of the Indiana Election Division<br>302 W. Washington St., Room E204<br>Indianapolis, IN 46204 |
| Angela M. Nussmeyer<br>Co-Director of the Indiana Election Division<br>302 W. Washington St., Room E204<br>Indianapolis, IN 46204 | Ray Adler<br>Hamilton County Election Board<br>Election Office<br>1 Hamilton County Square, Suite 106<br>Noblesville, IN  46060 |
| Paul Rausch<br>Porter County Board of Elections and<br>Registration<br>155 Indiana Avenue, Suite 105<br>Valparaiso, IN 46383 | Kevin C. Smith<br>Lake County Board of Elections and<br>Registration<br>2293 N. Main St., A205, 2nd Floor<br>Crown Point, IN 46307 |
| Randall Vonderheide<br>Tippecanoe County Board of Elections and<br>Registration<br>20 N. 3rd Street<br>Lafayette, IN 47901 | **Courtesy copy to**:<br>Office of the Attorney General<br>IGCS-5th Floor<br>302 W. Washington St.<br>Indianapolis, IN 46204 |