UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-01825-RLY-TAB |
| | ) | |
| CONNIE LAWSON, in her official capacity as | ) | |
| Indiana Secretary of State; | ) | |
| PAUL OKESON, | ) | |
| S. ANTHONY LONG, | ) | |
| SUZANNAH WILSON OVERHOLT, and | ) | |
| ZACHARY E. KLUTZ, in their official | ) | |
| capacities as members of the Indiana Election | ) | |
| Commission; | ) | |
| J. BRADLEY KING and | ) | |
| ANGELA NUSSMEYER, in their official | ) | |
| capacities as co-directors of the Indiana | ) | |
| Election Division; and | ) | |
| RAY ADLER, | ) | |
| PAUL RAUSCH, | ) | |
| KEVIN C. SMITH, and | ) | |
| RANDALL VONDERHEIDE, in their official | ) | |
| capacities as county election officials, and as | ) | |
| representatives of a class of all members of | ) | |
| Indiana county election boards and boards of | ) | |
| elections and registration, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This cause appears before the court on Plaintiff's Motion for Preliminary

Injunction. Common Cause Indiana seeks to enjoin three statutes in Indiana's Election

Code (the "Challenged Amendments"). Common Cause alleges Indiana Code § 3-11.7-

7-2 (the "Standing Amendment") and Indiana Code §§ 3-11.7-3 and 3-11.7-4 (the

"Remedies Amendment") unconstitutionally burden the fundamental right to vote and violate the Supremacy Clause.  Common Cause  also alleges the Standing Amendment violates procedural due process.  Defendants oppose Plaintiff's motion and defend the constitutionality of the statutes.[1]  For the reasons that follow, Plaintiff's motion is **GRANTED**.

## I.      Factual and Procedural Background

In 2019, Indiana overhauled its Election Code.  Among the changes were the statutes at issue here.  Under the Standing Amendment, "[o]nly a county election board has standing in an Indiana court or with any other state governmental entity to file an action or petition to request the extension of the hour for closing the polls by the court or entity."  Ind. Code § 3-11.7-7-2(a).  Polls in Indiana open at 6 a.m. and close at 6 p.m.  *Id.* § 3-11-8-8(a).  The board may only file an action upon the unanimous vote of its members.  *Id.* § 3-11.7-7-2(b).  Prior to 2019, voters could go directly to state court to seek an extension of polling place hours when they encountered barriers to casting their ballot.  (Filing No. 3-34, Declaration of Julia Vaughn, ("Vaughn Aff.") ¶ 3).  These barriers could include a closed polling location or some other condition at a polling site that prevented the voter from casting a ballot.  *Id.*

The Remedies Amendment limits any extension to only those polls "whose opening was delayed or which closed during" normal voting hours, and for a period of

---

[1] The State Defendants filed the primary opposition to Plaintiff's motion for a preliminary injunction.  (Filing No. 56).  All remaining Defendants joined that filing.  (Filing Nos. 52, 55, 59, 62, 63, 64).

time not more than the time the polls were closed.  Ind. Code § 3-11.7.7.4.  Before

issuing an order extending polling hours, the Remedies Amendment requires the court to

make the following six findings: (1) the polling location was "substantially delayed in

opening"; (2) the specific precincts or vote centers[2] that experienced delays; (3) how long

the polling location was closed; (4) substantial evidence exists that voters were prevented

from casting a ballot due to the delay or closure of the polling location; (5) the harm can

only be ameliorated by an extension of polling hours; and (6) the county election board

filed written notice with the Secretary of State and the election division indicating that

that county election board both filed the action or petition with the court to extend hours

and received confirmation from the court of the receipt of the filings.[3]  *Id.* § 3-11.7-7-

3(a).  If the court is unable to make these findings, the court "shall not" issue an order

extending polling hours.  *Id.* § 3-11.7-7-3(b).

Plaintiff, Common Cause Indiana, is the Indiana affiliate of Common Cause, a

non-profit, nonpartisan public-interest group.  (Vaughn Aff. ¶ 3).  The organization's

mission is to advocate for ethics, good government, constitutional law, and the

elimination of barriers to voting.  (*Id.*)  Common Cause Indiana is based in Indianapolis

and has at 15,000 members who are eligible to vote in Indiana.  (*Id.* ¶¶ 4, 8).

Defendants in this case include representatives of each entity charged with

administering and overseeing elections in Indiana (collectively the "State Defendants").

---

[2] Some counties in Indiana establish vote centers, while others use the precincts.  (Filing No. 3-34, Meredith Decl. ¶ 34).

[3] The sixth required finding was included under a 2020 amendment.  P.L. 141-2020.

The Secretary of State, Connie Lawson, "is the state's chief election official."  (Filing No. 1, Compl. 13); Ind. Code § 3-6-3.7-1.  Among other responsibilities, the Secretary "shall perform all ministerial duties related to the administration of elections by the state."  Ind. Code § 3-6-4.2-2(a).  Defendants Paul Okeson, S. Anthony Long, Suzannah Wilson Overholt, and Zachary Klutz currently serve on the Indiana Election Commission. (Compl. ¶ 14).  The Commission is a bipartisan entity consisting of four individuals appointed by the governor.  Ind. Code § 3-6-4.1-2.  The Commission is statutorily obligated to "[a]dminister Indiana election laws", *id.* § 3-6-4.1-14(a)(1), "[a]dvise and exercise supervision over local election and registration officers", *id.* § 3-6-4.1-14(a)(3), and investigate suspected election law violations, *id.* § 3-6-4.1-21.  Defendants J. Bradley King and Angela Nussmeyer currently serve as co-directors of the Indiana Election Division.  (Compl. ¶ 15).  The Election Division is housed within the Office of the Secretary of State.  Ind. Code § 3-6-4.2-1.  Its purpose is to assist the Election Commission and the Secretary in the administration of Indiana's election laws.  *Id.* § 3-6-4.2-2.

Finally, Defendants Ray Adler, Paul Rausch, Kevin Smith, and Randall Vonderheide (collectively the "Class Defendants") serve on the election boards of Hamilton County, Porter County, Lake County, and Tippecanoe County, respectively. (Compl. ¶¶ 16-19).  Common Cause named these individuals as representatives of a proposed class to include all members of Indiana county election boards and boards of elections and registration.  (Filing No. 6, Motion to Certify Class of Defendants).  County election boards "[c]onduct all elections and administer the election laws within the

4

county," prepare all ballots, and distribute those ballots to precincts or voting centers within the county.  Ind. Code § 3-6-5-14.

The composition of each county's election board varies according to county's population.  The majority of counties—89 out of Indiana's 92 counties—have an election board comprised of three members: the circuit court clerk and two people appointed by the clerk, one from each of the two major political parties.  (Compl. ¶ 39); Ind. Code § 3-6-5-2.  The members of the board elect a chair, *id.* § 3-6-5-8, who must call a meeting of the board "whenever the chairman considers it necessary for the performance of the board's duties." *Id.* § 3-6-5-11.  If the chair fails to call a meeting of the board for any reason, the other two members may meet to execute the powers and duties of the board. *Id.* § 3-6-5-12.

In counties containing 150,000 to 170,000 people, the election board has five members: the circuit court clerk and two people appointed by the county chairperson of the two major political parties.  Ind. Code § 3-6-5.6-1; *id.* § 3-6-5.6-4.  Only Porter County meets this definition.  (Compl. ¶ 39).  In counties containing 170,000 to 175,000 people, the election board has three members: the circuit court clerk and one person appointed by the county chairperson from the two major political parties.  Ind. Code § 3-6-5.4-1; *id.* § 3-6-5.4-4.  Tippecanoe County is the sole county within this definition. (Compl. ¶ 37).  In counties containing 400,000 to 700,000 people, the election board has five members: the circuit court clerk and two people appointed by the county chairperson of the two major political parties.  Ind. Code § 3-6-5.2-1; *id.* § 3-6-5.2-4.  Only Lake County falls within this class.  (Compl. ¶ 38).

## II.     Legal Standard

The preliminary injunction analysis proceeds in two stages.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am. Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008).  First, the moving party has the burden of making a threshold showing: (1) it has some likelihood of success on the merits; (2) it lacks an adequate remedy at law; and (3) without an injunction, it will suffer irreparable harm before its claim is resolved.  *Id.* at 1086.  If the plaintiff makes this initial showing, the court then weighs the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one.  *Id.*  This assessment is made on a sliding scale: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018) (quoting *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086).  As part of this balancing, the court must also consider whether a preliminary injunction is in the public interest.  *Id.*

## III.    Analysis

### A.     Standing

Common Cause asserts both organizational and associational standing.  An organization may assert standing for injunctive relief if it is "under an actual or imminent threat of suffering a concrete and particularized injury in fact," the injury is fairly traceable to the defendant's conduct, and it is likely that a favorable judicial decision will redress the injury.  *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019).

6

Common Cause has organizational standing to bring this challenge.  Indeed, the Seventh Circuit recognized Common Cause's organizational standing to challenge another Indiana election law in *Lawson*, and the court sees no reason to depart from that analysis.  An election law which "'compel[s an organization] to devote resources' to combatting the effects of that law that are harmful to the organization's mission" causes an injury for purposes of standing.  *Id.* at 950 (quoting *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd on other grounds*, 553 U.S. 181 (2008)).  As part of its core mission, Common Cause works to expand access to the polls in Indiana. (Vaughn Aff. ¶ 5).  When the Challenged Amendments were proposed, Common Cause Indiana expended time and resources educating legislators on the harmful effects the bills might have on Indiana voters.  (*Id.* ¶ 10).  As a result of the Challenged Amendments, Common Cause Indiana has had to train or retrain its volunteers on how to respond to issues at polling places.  *Id.* ¶ 19.  The time and resources devoted to these efforts otherwise would have been spent on other programs.  (*Id.* ¶ 11).  Defendants' statutory obligations to administer elections and enforce Indiana's Election Code, including the Challenged Amendments, satisfy the traceability requirement.  If the Challenged Amendments remain in place, Common Cause will continue to divert time and resources away from other programs to respond to the issues created by the laws, including identifying, contacting, educating, and possibly lobbying members of county election boards to seek an extension of polling hours.  (*Id.* ¶ 24-25).  A favorable ruling in the form of an injunction would redress this future harm.

Common Cause also has associational standing.  An organization may assert associational standing if: "(a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Common Cause Ind.*, 937 F.3d at 957 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Common Cause Indiana has at least 15,000 members who are eligible to vote in Indiana elections.  (Compl. ¶ 12).  These individuals would have standing to sue in their own right because the Challenged Amendments threaten their right to vote in the upcoming election.  This lawsuit seeks to protect Indiana voters' access to the ballot box, which is germane to the organization's voting rights mission.  Finally, the claim asserted and the relief requested do not require the participation of individual members.  Associational standing depends "in substantial measure on the nature of the relief sought." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 602 (7th Cir. 1993) (quoting *Warth v. Seldin*, 422 U.S. 490 515 (1975).  Common Cause seeks injunctive relief which will "inure to the benefit of the members actually injured and thus individualized proof of damages is often unnecessary." *Id.*  And as the Seventh Circuit recognized with respect to this final *Hunt* prong, there is no indication that "the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association." *Id.*  Common Cause satisfies the requirements for associational standing.

## B.    Likelihood of Success on the Merits

To obtain a preliminary injunction, the Plaintiff must show it has "some likelihood of success on the merits." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. The Plaintiff does not need to demonstrate a likelihood of absolute success on the merits. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017). "Instead, [it] must only show that [its] chances to succeed on his claims are 'better than negligible.'" *Id.* (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). "This is a low threshold." *Id.*

Plaintiff argues the Challenged Amendments violate the U.S. Constitution for three reasons: they place an unconstitutional burden on the right to vote, they violate the Supremacy Clause, and they deny Indiana voters procedural due process. For the reasons that follow, the court finds Plaintiff is likely to succeed on its claim that the Challenged Amendments unconstitutionally burden the right to vote. The court does not need to address Common Cause's other arguments.

In a free and democratic society, the right to vote is fundamental. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966). "[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). In a pair of cases, the Supreme Court laid out the framework courts should apply to challenges to state election laws. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (together "*Anderson-Burdick*"). *See also Harlan v. Scholz*, 866 F.3d 754, 759 (7th Cir. 2017). A court must weigh:

9

> the character and magnitude of the asserted injury to the rights protected by
> the First and Fourteenth Amendments that the plaintiff seeks to vindicate
> against the precise interests put forward by the State as justifications for the
> burden imposed by its rule, taking into consideration the extent to which
> those interests make it necessary to burden the plaintiff's rights.

*Burdick*, 504 U.S. at 434 (internal quotations omitted). The rigor with which a court evaluates the propriety of a state election law depends on the extent to which the law burdens the right to vote. *Id.* "Rather than applying any 'litmus test' that would neatly separate valid from invalid restrictions, . . . a court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008) (Stevens, J., controlling opinion). "However slight [a] burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).

Taking the Standing Amendment first, the court must identify how it burdens the right to vote. The Standing Amendment prevents any entity other than a unanimous county election board from "fil[ing] an action or petition" in state court "to request the extension of the hour for closing the polls" when there are unforeseen barriers to casting a ballot. This burdens the right to vote because when voters face disenfranchising conditions at their polling place, the Standing Amendment can deny them an opportunity to vindicate their right to vote by seeking relief in an Indiana court. Rather than allowing a voter to go directly to state court to seek an order extending polling hours, the Standing

10

Amendment requires her to navigate a multi-step process with potentially hours or even minutes to spare.

Imagine a voter plans to vote after leaving work at 5:00 p.m. When she arrives at her polling location, she is told she can't vote right now because they ran out of ballots. If she is unable to wait until more ballots arrive or is unable to return by 6:00 p.m., she will have lost the right to vote. Before the Standing Amendment's adoption, any of the individuals at that polling location could ask the court to extend the polling hours to make up for the time when voters could not vote. But the Standing Amendment forecloses that option. Instead, the voter must embark on a campaign to identify, contact, and potentially convince a group of three or even five members of her county election board to file the request. If she is unable to accomplish any of these tasks before 6:00 p.m., she will be unable to vote.

The Standing Amendment does not give any guidance on how a voter is to petition her county election board, and it fails to provide any recourse should she be unable to identify or contact every member of board. More troubling is the lack of any method to challenge a board's refusal or failure to act. It is worth noting that the process of petitioning members of the county election board can be particularly fraught given the political nature of county election boards: every county election board includes representatives of the two major political parties, and in some cases those individuals are appointed by the county chairperson of the party. If a voter believes the board's refusal to convene or seek an extension of polling hours was based on partisan or other improper motives, the Standing Amendment does not identify any method for the voter to

11

circumvent the board's unanimity requirement or file a request directly with the court. Even putting improper motives aside, the voter is still without recourse if she is unable to obtain unanimous consent due to the absence or unavailability of one or more of the board members. Because the Porter and Lake County election boards have five members rather than three, voters in those counties face the additional burden of identifying and contacting an additional two members.

Even if a voter were able to complete each of these steps, the Remedies Amendment poses its own burden on the right to vote by foreclosing an extension of polling hours unless the polling location was physically closed. It allows for no relief if a voter faces some other disenfranchising condition at the polls. Consider the following two scenarios. In the first, a voter arrives at her polling location when polls open at 6:00 a.m. only to find the doors are locked. The poll workers arrive and unlock the doors at 6:45 a.m., but the voter has already left for work. If she is unable to return to her polling location by 6:00 p.m. when the polls close, she will be unable to vote. But her county election board may file a request in state court to extend polling hours an additional 45 minutes because the polling location was physically closed. In the second scenario, a voter arrives at the polling location at 3:00 p.m. but is told she cannot vote because their electronic voting machines are down. Like the first voter, if she cannot return to the polling location by 6:00 p.m., she will have lost her right to vote. But in this scenario, even if the county election board filed a request for an extension of hours, the Remedies Amendment denies any relief. While there is no difference between disenfranchisement caused when a polling location is physically closed and when one is open but without

12

functioning machines or ballots, the Remedies Amendment limits relief to the former.  A voter facing one of the other barriers is simply out of luck.

These scenarios are not merely hypothetical.  In the 2018 election, a Monroe County judge approved a request from the Monroe County Clerk's Office to keep polls open until 7 p.m. after several polling locations in Monroe County ran out of ballots on Election Day.  (Filing No. 3-6, Schweizer Decl. Ex. E 11.6.2018 Article, Indiana Public Media).  Johnson County experienced similar issues when equipment and server malfunctions caused significant delays.  (Filing No. 3-2, Schweizer Decl. Ex. A 11.6.2018 Article, 13 WTHR).  Common Cause helped a Johnson County voter file a request in state court seeking an extension of polling hours, but it was denied because the polls had already closed.  *Newland v. Johnson Cty., Ind. Election Bd.*, Case No. 41C01-1811-MI-000263 (Johnson Cty. Ct.).  If either scenario were to happen again in 2020, both of the Challenged Amendments would bar relief.  The Standing Amendment would preclude the County Clerk or the individual voter from filing the action at all, while the Remedies Amendment would foreclose relief because the polling locations were never closed or delayed in opening.

So what interests does the State put forward to justify the burdens imposed by these laws?  The State's brief contains a passing reference to an interest in structuring election laws to protect the integrity of the election, but it fails to expound on that point.  The State may not simply invoke the phrase "election integrity" without further explanation.  The State also suggests it has an interest in promoting fair elections and avoiding voter confusion.  While not going into great depth on either of these interests,

13

the State argues the Challenged Amendments help Indiana conform its laws to federal requirements and provide a clear procedure to obtain an extension of polling hours. The Help America Vote Act requires that ballots cast pursuant to a court order extending polling-place hours be cast as provisional ballots. 52 U.S.C. § 21082(c). These ballots are separated and held apart from other provisional ballots in the event the hours extension was improperly granted. *Id.* But Indiana already passed a law satisfying this federal requirement, Indiana Code § 3-11.7-2-1, and enjoining the Challenged Amendments would not put Indiana out of compliance with federal law. And while avoiding voter confusion is a laudable goal, the answer is not to burden the right to vote by making it more difficult for a voter to obtain relief when faced with disenfranchising conditions.

The State defends the Challenged Amendments in two ways. First, Defendants attempt to reframe Common Cause's challenge in a way that would subject the Challenged Amendments to rational basis review, rather than the *Anderson-Burdick* test. But even under the *Anderson-Burdick* test, Defendants argue the Challenged Amendments survive because the court must evaluate the state's interest by looking at the whole electoral system. Neither argument is persuasive.

Starting with the first argument, the State attempts to recharacterize Common Cause's argument as simply asserting a right to extend poll hours in extenuating circumstances. Because Indiana law provides alternative methods to vote if a voter is unable to vote on Election Day, Defendants claim Common Cause has not alleged an infringement on the right to vote. As a result, the Challenged Amendments should be

14

subject to rational basis review.  *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807-08 (1969) (applying rational basis review to an Illinois law that limited who could vote absentee because it is "not the right to vote that is at stake here but a claimed right to receive absentee ballots.").  But this case does not fall within *McDonald*'s framework.  The Court in *McDonald* rejected subjecting the challenged law to more exacting scrutiny for two reasons.  *Id.* at 807.  First, the law did not draw distinctions on the basis of wealth or race.  *Id.*  Second, and of particular relevance to the present case, the Court found nothing in the record to indicate that the state's statutory scheme had any impact on the plaintiff's ability to exercise the fundamental right to vote. *Id.*

Here, the record demonstrates the Challenged Amendments' impact on the right to vote.  Common Cause provided the Declaration of Dr. Marc Meredith, an expert on election mechanics and voting behavior from the University of Pennsylvania, to describe the effect the Challenged Amendments will likely have on voting behavior.[4]  According to Dr. Meredith's testimony, poll closures are not the only potentially disenfranchising condition that a voter may face on Election Day.  A voter's decision about whether to vote is determined by weighing the benefits of voting against the costs—this is known as the calculus of voting.  (Filing No. 3-34, Decl. of Dr. Marc Meredith ("Meredith Decl.") ¶ 12).  Voting costs can include forgoing wages in order to leave work to vote, sacrificing a conflicting obligation, the ease of getting to the polls, and the specific process voters

---

[4] Defendants did not object to Dr. Meredith's testimony.  The court finds he is qualified and his testimony is reliable and relevant.

must navigate in order to cast a ballot. (*Id.* ¶ 13). Long lines at the polls can cause voters to opt out of voting, even after arriving at the polling location. (*Id.* ¶¶ 16, 18). Long wait times also disproportionately increase the costs of voting for voters of color, compared to white voters. (*Id.* ¶ 17). Voters with full-time obligations on Election Day, such as work, school, or caretaking, are also particularly affected when the cost of voting increases during the limited period of Election Day when they are able to cast a ballot. (*Id.* ¶ 44). As Dr. Meredith makes clear, issues with voting machines, electronic poll books, paper ballots, and the availability of poll workers can all increase the cost of voting on Election Day. (*Id.* ¶¶ 21-23). Dr. Meredith contends it is "almost inevitable" that some Indiana voters will experience some condition that interferes with their ability to vote. (*Id.* ¶ 23). On top of all of this, the United States is in the midst of a pandemic necessitating extraordinary steps to keep voters safe. Social distancing, sanitizing requirements, and other measures are likely to exacerbate polling place issues. (*Id.* ¶ 22). But under the Challenged Amendments, none of those challenges would allow a court to extend voting hours. The record here makes plain that the Challenged Amendments will make it more difficult for voters facing unforeseen disenfranchising conditions to have their voices heard by casting a ballot. It is therefore appropriate to conduct a more exacting review of the statutes.

Defendants argue that the Challenged Amendments survive even the more exacting review under *Anderson-Burdick* because the court must weigh the burdens against the state's interests by looking at the whole electoral system. *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020). Defendants suggest that a voter might take advantage of

16

one of the alternative provisions in Indiana that "make it easy to vote." *Tully Okeson*,

No. 1:20-cv-1271, 2020 WL 4926439, at \*5 (S.D. Ind. Aug. 21, 2020).  Early in-person

voting takes place between October 6, 2020 and November 2, 2020; voters who satisfy

certain requirements may vote by mail; and eligible voters may have a poll worker bring

them a ballot so they may vote from home.  *Id.  See How to Vote Early in Indiana*,

https://www.in.gov/idr/voteearly.htm (last visited Sept. 17, 2020).  Finally, voters who

satisfy certain requirements may cast an absentee ballot at a location designated by the

circuit court clerk or at a satellite office.  Ind. Code § 3-11-10-26.

But these provisions do not remedy the burdens imposed by the Challenged

Amendments when a voter faces disenfranchising conditions at a polling location on

Election Day.  The State's suggestion that a voter could take advantage of these pre-

Election Day voting methods misses the point.  By the very nature of voting on Election

Day, early voting or absentee voting options are no longer available.  Other portions of

Indiana's election laws do not to help the State's case.  For example, Indiana, along with

two other states, has the earliest poll closing time in the country.  (Meredith Decl. ¶ 40).

Indiana also does not have a law mandating time off from work to go vote.  (*Id.* ¶ 41).

And Indiana only allows a voter to vote by mail in limited circumstances, such as being

absent from the county on Election Day during the entire 12 hours that the polls are open.

Ind. Code § 3-11-10-24.  While it is true that any voter in line when the polls close at

6:00 p.m. is entitled to cast a non-provisional ballot, Ind. Code § 3-11-8-11(a), the

challenges outlined by Dr. Meredith may prevent and deter voters from standing in line

for as long as is necessary.

The court finds Common Cause has carried its burden of showing it is likely to succeed on its claim that the Challenged Amendments unconstitutionally burden the right to vote.  Because Common Cause is likely to succeed on this first argument, the court does not need to address the Supremacy Clause or due process arguments.

### C.    Irreparable Harm with No Adequate Remedy at Law

The Court turns to the second and third elements of the preliminary injunction standard.  The party seeking a preliminary injunction must demonstrate that it will likely suffer irreparable harm without an injunction and that it has no adequate remedy at law. *Whitaker*, 858 F.3d at 1044.  While there must be more than a mere possibility of harm, the moving party does not need to show that the harm actually occurred or is certain to occur.  *Id.* at 1045.  Harm is considered irreparable if it "cannot be prevented or fully rectified by the final judgment after trial."  *Id.* (quoting *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1089.  Legal remedies are inadequate if any award would be "seriously deficient as compared to the harm suffered."  *Id.* at 1046 (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)).

Common Cause argues the Challenged Amendments will irreparably harm the organization because it will expend its limited time and resources to train volunteers on the amendments' effects and, on Election Day, work with voters in Indiana to identify, contact, and possibly persuade members of county election boards to seek extensions of polling place hours.  (Vaughn Aff. ¶ 21-26).  The time and resources spent as a consequence of the Challenged Amendments will be diverted from Common Cause's other efforts.  (*Id.*)  In fact, Common Cause explains it has already redirected valuable

18

time and resources to opposing the Challenged Amendments prior to passage. (*Id.* ¶ 10.) Common Cause further argues disenfranchising Indiana voters amounts to irreparable harm.

The irreparable harm here is clear. Not only do First Amendment violations presumptively cause irreparable harm, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006), "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases). As discussed above, alternative methods of voting are unavailable to a voter who decides to vote on Election Day. A voter who arrives at her polling location only to be told she cannot vote at that time may never have her voice heard in that election if she cannot be back in line before 6:00 p.m. "And once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law." *Id*. Unexpected complications on Election Day are not unusual in Indiana. In fact, Dr. Meredith stated it is "virtually inevitable" that at least some polling places will experience complications on Election Day. (Meredith Decl. ¶ 23). The court finds the Challenged Amendments, if left in place, are likely to cause irreparable injury to both Common Cause and Indiana voters for which there is no adequate remedy at law.

### D. Balancing of Harms and the Public Interest

The final consideration in determining whether to grant a preliminary injunction requires the court to balance the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one. *Girl Scouts of Manitou Council,*

*Inc.*, 549 F.3d at 1086. This includes considering whether an injunction would be in the public interest. *Id.*

As already discussed, the potential harm to Common Cause and Indiana voters is substantial. Conversely, Defendants risk no significant harm. If the Challenged Amendments are enjoined, Indiana voters will be able to go directly to court to seek an extension of hours. Indiana courts will again be able to grant relief when disenfranchising conditions occur at polling locations on Election Day. The public interest plainly favors the injunction. "Enforcing a constitutional right is in the public interest." *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019). *See also League of Women Voters of N.C*, 769 F.3d at 247 ("By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'") (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

## IV. Conclusion

For the foregoing reasons, Common Cause Indiana's Motion for Preliminary Injunction (Filing No. 3) is **GRANTED**. Defendants, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them are preliminarily enjoined from implementing, enforcing, administering, invoking, or giving any effect to Indiana Code §§ 3-11.7-7-2, 3-11.7-7-3, and 3-11.7-7-4.

**SO ORDERED** this 22nd day of September 2020.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

20